No. 80-181

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

THE MONTANA CONFERENCE OF THE SEVENTH-
DAY ADVENTIST CHURCH, a non-profit
corporation,

Plaintiff and Appellant,

vs.

ESTATE OF SOPHIE MILLER, Deceased, by
ARTHUR B. HARR, et al.,

Defendant and Respondent.

---

Appeal from:  District Court of the Fourth Judicial District,
In and for the County of Missoula.
Honorable John Henson, Judge presiding.

Counsel of Record:

For Appellant:

Gregory O. Morgan argued, Bozeman, Montana

For Respondent:

Murray, Holt and McChesney, Missoula, Montana
Harold L. Holt argued, Missoula, Montana
Morales, Volinkaty & Harr, Missoula, Montana
Jon E. Ellingson, Missoula, Montana

---

Submitted:  February 19, 1981

Decided:  June 1, 1981

Filed: JUN 2 1981

Thomas J. Kearney
_____
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Plaintiff, Montana Conference of the Seventh Day Adventist Church (Conference), appeals from a declaratory judgment of the Missoula County District Court holding that a personal guardianship and a property conservatorship did not prevent Sophie Miller from revoking a trust in which the Conference was both the trustee and a beneficiary in the event of her death or "incompetency."

Although the issues can be stated in various ways, the essence of this appeal is the claim by the Conference that because Sophie Miller was under a personal guardianship and her property was under a conservatorship, she was legally incapacitated from revoking the trust--a trust which provided that it was irrevocable upon the "incompetency" or death of Sophie Miller. A second issue inherent in this appeal, although not directly raised by the Conference, is the contention that the Conference proved at trial that Sophie Miller did not have the mental capacity on July 8, 1977 to revoke the trust.

After the Conference was notified that Sophie Miller had revoked the trust and the Conference refused to abide by the revocation, the Conference filed a declaratory judgment action in September 1977 to have the trust revocation declared invalid. The Conference, as trustee, claimed that Sophie Miller was legally incompetent to revoke the trust because she was then under a personal guardianship and her property was in the hands of a conservator. The complaint did not allege that Sophie Miller did not have the mental capacity on July 8, 1977 to revoke the trust. However, the defense was based in part on the contention that Sophie

-2-

Miller had the required mental capacity to revoke the trust.

The trust, created in 1968, when Sophie Miller was 85 years old, named the Conference as trustee and beneficiary. It was to become irrevocable upon the death or incompetency of Sophie Miller. Before its revocation, it was amended 6 times, and usually each amendment increased the Conference's share of the estate. Originally, 30 percent of Sophie's estate was to go to the Conference, 15 percent to the General Conference Foreign Mission Fund, and 15 percent was to go to the Voice of Prophecy (a Conference-connected organization which is an organization that provides a way for Seventh Day Adventists to continue spreading the good word after their death). The remainder of the estate was to go to Sophie's two daughters and her grandchildren. Under the last trust amendment, the Conference was to get 56 percent of the estate and the Voice of Prophecy was to get 25 percent of the estate. The remaining estate (19 percent) was to go to Sophie's daughters and her grandchildren.

In April 1977, Ruth Mahle, Sophie Miller's granddaughter, petitioned the District Court to be appointed personal guardian for Sophie and conservator for Sophie's estate. These petitions were filed under the provisions of the Uniform Probate Code, effective July 1, 1975. The court appointed the granddaughter as temporary guardian but took no immediate action on the application for conservatorship. The court set July 7, 1977 to hear the application for guardianship and application for conservatorship. In early June 1977, the District Court appointed attorney Arthur B. Harr to represent Sophie Miller at the guardianship and conservatorship hearing. The trust revocation came about while Harr was acting in his capacity as attorney for Sophie Miller.

-3-

The circumstances leading to the trust revocation
in July 1977, were triggered by Sophie's illness in the
spring of 1977. Until the spring, Sophie Miller was still
able to take care of herself and her Missoula home. But
after a two week hospital stay in the spring, Sophie was very
weak and could not take care of herself or her home. In
April 1977, Ruth Mahle, a granddaughter, petitioned the District
Court to be appointed Sophie's personal guardian and conservator
of her property. She was appointed as temporary guardian but
no order was then entered on her petition for conservatorship.

For the next two months, Frieda Miller Benson, a daughter,
and Ruth Mahle, the granddaughter, were unable to agree on
where Sophie Miller could best be cared for, and had Sophie
in and out of her Missoula home, hospitals and nursing homes.
Finally, in June 1977, the granddaughter, as temporary
guardian, brought Sophie to a nursing home in Ronan, and
Sophie lived there until her death in February 1978, at age
96. The granddaughter, who visited Sophie Miller more than
other relatives, both before and after her illness, lived
in St. Ignatius, near Ronan, and this made it easier for
her to visit Sophie and attend to her needs. The granddaughter
could not do this as easily if Sophie had stayed in a nursing
home in Missoula.

As stated earlier, in early June 1977, the District
Court appointed attorney Harr to be guardian ad litem for
Sophie Miller, and to represent her interests on the application
of the granddaughter to be personal guardian and conservator
of Sophie's property. On June 15, Harr had a long visit
with Sophie Miller at the Ronan nursing home--and tape
recorded this conversation. Most of the directed questioning
concerned whether Sophie Miller wanted the granddaughter,

Ruth Mahle, to be her guardian and conservator. The response was that she would rather have Ruth Mahle do this than anyone else. (This tape and a transcript of the tape were admitted in evidence at trial.)

On July 6, the day before the scheduled hearing, Harr again visited Sophie Miller, and had a long conversation with her--which was again tape recorded. (This tape and a transcript of the tape were admitted in evidence at the trial.) She expressed dismay that by the trust agreement and her will, she had left so little to her children and grandchildren. In response to a very nonleading question asking her what she should do about her property, she declared that the property distribution scheme was "absolutely not" justice to her children and grandchildren. It was because of this clearly expressed declaration that Harr later prepared the trust revocation for Sophie to sign.

The hearing on the application for guardianship and conservatorship took place on July 7, 1977. It was a brief hearing, lasting no more than 30 minutes, and, unfortunately, no court reporter was present. Although Sophie Miller was not present, Harr was there to represent her interests as her court-appointed attorney. The Conference disputes what took place, but the unrefuted testimony as to what took place is that both the guardianship and conservatorship applications were made because of the feeling that Sophie Miller could not take care of her person or property, and not because she lacked the mental capacity.

No order was issued on July 7, but four days later (on July 11), the District Court appointed the granddaughter as guardian for Sophie Miller and also attorney Harr as temporary conservator of Sophie Miller's property. The guardianship order stated that Sophie Miller was "incapacitated by physical disability and advanced age . . ." The

-5-

conservatorship order stated "that Sophie Miller is a person for whom appointment of a conservator is proper for reasons of physical disability and advanced age."

On July 8 (between the July 7 hearing and the July 11 orders) Sophie Miller signed the trust revocation. On this day, acting on the basis of the tape-recorded conversation he had with Sophie Miller on July 6 to the effect that she did not like the property distribution scheme set up in the trust, attorney Harr prepared a trust revocation and took it to Ronan for Sophie Miller to sign. She signed it in the presence of Harr.

On July 12, the day after he had been appointed conservator for Sophie Miller's property, Harr wrote to the Conference and told them that Sophie Miller had revoked the trust on July 8, that he had been appointed conservator on July 11, and that Ruth Mahle had been appointed guardian on July 11. He also requested that the Conference turn over the trust assets to him.

Later, on August 17, 1977, Harr visited Sophie Miller and had another tape-recorded conversation with her in the morning--his object was to find out what she wanted done with her property. (The tape and a transcript of the tape were admitted in evidence at the trial.) Later that afternoon, Sophie Miller signed a will that was witnessed by Elizabeth J. Doty, and Dr. Gerald Moredock, a medical doctor. This will gave the Conference 25 percent of Sophie Miller's property, and the remaining 75 percent was to be divided 15 percent to each of two daughters, and 45 percent was to be split between 11 grandchildren. The estate is a modest one.

Between July 1, 1977 and September 19, 1977, (when the Conference's petition for declaratory judgment was filed)

Harr invited the attorney for the Conference or any member of the Conference to visit Sophie Miller at the nursing home so that they could get firsthand knowledge of what her wishes were on her property distribution and so they could observe her mental capacity. They never visited Sophie, even though the Conference had been told that even under Sophie's new will, the Conference was to get 25 percent of her property. Sophie died on February 19, 1978, before this case was tried.

At trial, and on appeal, the Conference argues that the law in effect in 1968, when the trust was first created, should control this proceeding. With this as its premise, the Conference then argues that the 1968 statutory scheme on guardianships incapacitates a person from revoking a trust if a guardian has been appointed. We do not have to decide this second question because the Conference is in error on its first premise. The Uniform Probate Code (effective July 1, 1975) was in effect for two years when the guardian and conservator were appointed on July 11, 1977.

Section 72-1-107, MCA (formerly section 91A-6-102, R.C.M. 1947) not only provides an effective date of July 1, 1975, but more important here, declares that the code is to govern all proceedings in court after its effective date unless it would be unjust to do so. Because the 1968 statutes had been repealed in 1975, we see no reason to apply them to a guardianship and conservatorship proceedings started in 1977, two years later. Further, section 72-1-107, MCA (formerly section 91A-6-102), states that the Uniform Probate Code must govern if it conflicts with any statutes adopted before enactment of the Uniform Probate Code. If there is no conflict between the 1968 and 1975 law, the Conference

-7-

then can show no prejudice by the use of the 1975 statutes, for the result would be the same under either the 1968 or 1975 statutes. But should there be a conflict between the 1975 law and the 1968 law, section 72-1-107, MCA, of the 1975 law expressly declares that the Uniform Probate Code shall control. The Conference has raised no constitutional issue, and we see no valid constitutional argument to prevent application of the 1975 Uniform Probate Code in this case. We hold, therefore, that the Uniform Probate Code controls.

The Conference further contends that even under the Uniform Probate Code, the combination appointment of a personal guardian plus a conservator for the estate, made Sophie Miller legally incapable of revoking the trust. First, the Conference is in error on its dates. When the trust was revoked on July 8, 1977, a permanent guardian had not yet been appointed, nor had a conservator been appointed. That was not done until July 11, 1977. (It is true, however, that the granddaughter had been appointed the temporary guardian in April 1977, before the revocation of the trust agreement.) Second, assuming that a conservator had been appointed before Sophie Miller revoked the trust, it would have had no effect on her capacity to revoke the trust. Section 72-5-421(5), MCA (formerly section 91A-5-408, R.C.M. 1947) expressly states that an order finding a basis to appoint a conservator "has no effect on the capacity of the protected person." Thus, even if a conservator had already been appointed before Sophie Miller revoked the trust, the order could not have decided her mental capacity to revoke the trust. Even the order appointing the conservator (entered after the trust was revoked) is of no aid to the Conference's argument. It stated that "Sophie Miller is a person for whom appointment of a

conservator is proper for reasons of physical disability and advanced age."

Although all of the same considerations do not apply, we reach the same basic decision on the guardianship proceedings. The application for appointment of a guardian alleged that Sophie Miller ". . . is an incapacitated person by reason of the fact of advanced age and diminished mental capacity." (Emphasis added.) But the allegation as to "diminished mental capacity" is not found within the definition of an "incapacitated person" in section 72-5-101(1), MCA, which sets out the grounds to apply for guardianship of an adult. Of course, no order had been entered on July 8 appointing a guardian--that order did not come until July 11. It is true that Ruth Mahle had already been appointed the temporary guardian of Sophie Miller (April 7, 1977) but we do not have that order before this Court. Even if we had that order, it would not change the result here because all the evidence points to the fact that a guardianship was desired, and a guardian was appointed, because Sophie Miller was physically incapable of taking care of herself, not because she was mentally incapacitated.

There is no record of the guardianship hearing, but the unrefuted testimony at trial from those who were present at the guardianship proceeding on July 7, is that application was made on the basis of, and the testimony was, that Sophie Miller was physically incapable of taking care of herself. The July 11 order setting out the reason for appointment of a guardian, stated "that Sophie Miller was 'incapacitated by physical disability and advanced age.'" Furthermore, we cannot ignore the efforts of attorney Harr in inviting any member of the Conference or its attorney to visit with Sophie

Miller to find out for themselves that Sophie Miller had the mental capacity to revoke the trust and that she intended to do so. The Conference ignored those offers, apparently on the advice of its lawyer.

We do not feel we are splitting straws or miscontruing the intent of the guardianship statutes in reaching this decision. The statute setting out the grounds for appointment of a guardian for an adult, section 72-5-101(1), supra, is directed at the inability of one to make "responsible decisions concerning his person . . ." or "a rational decision with respect to his need for treatment . . ." It is silent on the legal effect a guardianship appointment has on the ward's capacity to sign legally binding papers. Therefore, we are unwilling to declare here that Sophie Miller lost her legal capacity to revoke the trust when a temporary guardian had been appointed. The statute is not directed at incapacitating a ward from making any decisions regarding his property. Further, the guardianship hearing was not directed at Sophie Miller's mental capacity, and the order appointing the guardian declared that Sophie Miller was "incapacitated by physical disability and advanced age." We reserve judgment on the effect of a guardianship appointment where mental capacity is the issue and where a guardian is appointed because the ward is mentally incapacitated. This is not the issue in this case.

Thirty-one states, plus England and Canada, support the rule that the mere fact that an adult is under a guardian-ship does not deprive him of the power to make a will, or to revoke a will made by him, before he, as an adult, was placed under guardianship. 89 A.L.R.2d 1122; also see, 79 Am.Jur.2d Wills § 58, at 319. The reason is that an adult

-10-

may require a guardianship because of incapacity in one particular area, but he may still be entirely competent in other respects. 89 A.L.R.2d at 1122. That is the situation here: Sophie Miller needed a guardian not because of her mental incapacity, but because of her physical incapacity-- she could no longer take care of herself or her home.

After ruling that the 1975 Uniform Probate Code applied and that the guardianship order and conservatorship order did not nullify the right of Sophie Miller to revoke the trust agreement, the trial court then had to interpret the word "incompetency" as contained in the trust. The word "incompetency" was not defined in the trust agreement, nor is the word used in the Uniform Probate Code. Because there is room to disagree on the meaning of "incompetency", the trial court declared that the meaning is ambiguous and strictly construed the meaning against the Conference because the Conference chose the word for its printed forms. The trial court therefore construed the word "incompetency" to mean the "complete mental incompetency and lack of under-standing of the Trustor [Sophie Miller] at the time she executed the revocation." The trial court then concluded that Sophie Miller was mentally competent on the day she signed the trust revocation, and that she intended to revoke the trust. The Conference objects to the trial court strictly construing the word "incompetency" against the Conference, but the trial court was correct. Any ambiguity should have been resolved against the Conference, for the Conference not only supplied the printed form for the trust agreement but was also a beneficiary under the trust agreement.

Finally, although the Conference did not raise an issue the trial court's findings and conclusions that Sophie

Miller was mentally competent when she revoked the trust, the respondents argue that this is the only issue and that the evidence abundantly shows that Sophie Miller was competent when she revoked the trust. Several witnesses testified to Sophie Miller's mental condition, including Harr, who was present when she revoked the trust, the granddaughter Ruth Mahle, who had more opportunity than anyone to observe Sophie Miller's mental condition, and Elizabeth Doty, the owner-administrator of the Ronan nursing home where Sophie Miller stayed. In addition to their testimony, tape recordings and transcripts of conversations Sophie Miller had with Harr were admitted in evidence. Only one witness, Frieda Miller Benson, Sophie Miller's daughter, testified that she did not believe Sophie had the mental capacity to revoke the trust.

The Conference attacks the testimony of attorney Harr, of the guardian, Ruth Mahle, and of the nursing home operator, Elizabeth Doty, on the grounds that each of them had something to gain. But they were competent witnesses and the weight to be given to their testimony was for the trial court, not this Court. The trial court chose to believe them.

The judgment of the District Court upholding Sophie Miller's revocation of the trust agreement is affirmed.

Daniel J. Shea
Justices

-12-

We Concur:

_____

_____

_____

_____
Justices

-13-