No. 94-252

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

In the Matter of the Estate of
DON C. WEST

    Appellant.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
                In and for the County of Yellowstone,
                The Honorable Robert W. Holmstrom, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

       Terry L. Seiffert, Billings, Montana

       For Respondent:

       R. Bruce Harper, Harper & Stusek, Billings, Montana

                 Submitted on Briefs:  October 28, 1994
                          Decided:  December 20, 1994

Filed:



                    Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal from the District Court of the Thirteenth Judicial District, Yellowstone County, of an order establishing a limited guardianship and terminating the general guardianship of Don C. West. The order also continued a conservatorship with Norwest Capital Management and denied a joint petition from the protected person, his guardian and the conservator to substitute the conservatorship with a trust. We affirm.

The questions for review are:

I. Did the District Court err in establishing a limited guardianship?

II. Did the District Court err in denying the joint petition to terminate the conservatorship?

Don C. West (Don) is a "protected person" whose personal and financial interests have been managed by his mother, Mary Lou West, as guardian, and Norwest Capital Management Co.-Montana, formerly Northwestern Union Trust Co., as conservator, since 1978. In October of 1976, Don sustained severe injuries in a motor vehicle accident in New Mexico, when a vehicle in which he was a passenger collided with an oil tanker. As a result of this accident, Don suffered extensive physical injuries, including burns, blindness and head and leg injuries. He suffers from motor difficulties in his legs and has some deformity in his legs and ankles which requires him to wear braces. His head injuries caused some mental impairment and he has also lost physical sensitivity in his fingers because of burns.

Following the accident, Don remained in a coma for over three months. In November of 1976, a New Mexico state court declared Don an incompetent person "until such time he is able, unassisted to properly manage and take care of himself and his property." The New Mexico court also appointed his mother, Mary Lou West, as guardian ad litem. In her capacity as guardian ad litem, Mary Lou West initiated a personal injury suit in New Mexico on Don's behalf. The lawsuit resulted in a negotiated settlement in the spring of 1978.

In May of 1978, following the settlement, the Montana district court appointed Northwest Union Trust Co., now operating as Norwest Capital Management & Trust Co.-Montana (Norwest Capital), as conservator of Don's financial affairs. The conservatorship was initially funded with $463,319. By the end of 1978, after payment of medical expenses and other bills on Don's behalf, the value of the conservatorship was reduced to $374,323. Social Security Disability Payments have been deposited into the conservator-ship during the years of Norwest Capital's management of Don's estate. During the years since 1978, the conservatorship has increased in value under Norwest Capital's management, with the result that at the time of the hearing on this matter, the conservatorship held assets in the amount of $1,084,239. In recent years, the annual income of the conservatorship has consistently exceeded the amount necessary to meet Don's needs.

In June of 1978, the Montana district court also appointed Mary Lou West as general guardian. Mary Lou West has made several

personal care arrangements for her son in the years since 1978. In the last few years, however, she has been increasingly less involved in making such arrangements.

After being released from the hospital in January 1977, Don completed a rehabilitation program at St. Vincent's Hospital in Billings, Montana. His guardian then placed him in a rehabilitation program for the blind in Topeka, Kansas; followed by the Lighthouse Program for the Blind in Seattle, Washington; and then in High Hopes Brain Trauma Learning Center in Costa Mesa, California. After the High Hopes program, Don had live-in assistance in two separate living arrangements in Orange County, California. After being notified by California authorities that the second of those arrangements was unsatisfactory and had to be terminated within two days, Mary Lou West arranged for Don to fly to Billings, where he resided with her for a short time before being enrolled by her in The Villa in Greeley, Colorado.

Don was unhappy with the arrangements made by his mother in Greeley and, after a short time, he enrolled himself in the Colorado Rehabilitation Center, in Denver, Colorado. This program taught mobility, daily living skills, Braille typing and other skills to enable him to live on his own. With the assistance of these rehabilitation programs and physical therapy, Don has gradually recovered and achieved a great deal of self-reliance in many aspects of his life. At the time of the hearing in this matter, he had lived on his own for over a year.

Although Don is now 43 years old, currently lives alone and

4

has learned to be quite self-sufficient, he continues to require some assistance. At the time of the hearing, he employed a personal care manager, who assisted him with safety issues, personal hygiene, social activities and money management. Don hired his care manager after approval from Mary Lou West. The care manager communicates regularly with Mary Lou West concerning Don's personal affairs. Don has also hired other people--and sometimes fired them when they did not work out satisfactorily--to get his mail, pay his bills, clean his apartment and cook for him. He can cook some meals on his own using a microwave oven, but sensory loss in his fingers causes problems with cooking on an electric range.

Don uses the aid of customer assistance at stores when he purchases his food, clothing and other personal items. He arranges for his own transportation using taxis and can complete sales transactions on his own. However adept he has become, he recognizes that he must rely on the assistance of helpers and recognizes his limitations when it comes to managing his money and making investments. He testified that he knows that he needs assistance in financial matters and appreciates the manner in which Norwest Capital has handled his finances.

All the interested parties in this action agree that Don no longer needs the extensive assistance from others to manage his affairs that he needed at the time the guardianship and conservatorship were established in 1978. Indeed, the District Court emphasized and it is clearly evident in the record that Don has made a phenomenal recovery since that time, culminating in his

5

present ability to live independently and to arrange for necessary assistance from third persons without his guardian's help.

Evidence was presented at the hearing from several physicians to establish that Don no longer needs extensive assistance and to establish that he is capable of managing many of his personal affairs. However, the evidence also established that he has some "mental status abnormalities" consistent with the head injury he suffered in the 1976 accident and that some aspects of his personality are impaired due to the head injury as well. The physician preparing the report for purposes of this proceeding stated that Don suffers extremely gross deficits in information gathering (primarily due to the blindness), markedly impaired concentration, slightly impaired memory and markedly impaired mathematical skills. Despite these deficits, Don has recovered remarkably well and is able to live a relatively normal life. He brought this action to terminate the guardianship as he believes he no longer needs assistance in his daily living arrangements and feels he can handle such matters on his own.

Mary Lou West testified that she agrees that Don should have more latitude in decisionmaking, but she thinks he needs guidance in critical areas such as medical arrangements and education and training arrangements. Pam Ness, Vice President and Trust Officer for Personal Trusts for respondent Norwest Capital in Billings, manages the Don C. West Conservatorship. She testified that Norwest Capital objects to the complete removal of the guardianship in this matter and would be opposed to a trust arrangement rather

6

than a conservatorship if a third person is not involved in decisionmaking for Don. However, Mary Lou West and Norwest Capital agreed that a trust arrangement would more fully and adequately meet Don's current needs because it would allow Don to make some financial decisions with guidance from a third person. To the extent of his capacity to understand the nature of the proposed trust, Don agreed with that approach as well.

The primary motivation for this arrangement, as testified to by the witnesses, was to allow Don more latitude in gift-giving and to allow him to have some involvement in his personal financial affairs. According to the testimony, a trust could be tailored to meet Don's individual needs, such as tax and estate planning. Under the present conservatorship arrangement, financial transactions are subject to continuing court supervision and approval. Don has expressed an interest in giving money to his nephews and nieces for their college expenses. He also wanted to give his mother a new car as a surprise Christmas gift, but was unable to do so because the conservatorship limits gifts to approximately $12,000 per year, subject to court approval.

Dr. David B. Carlson of Deaconess Medical in Billings prepared the report for the District Court in this matter at the request of Don's counsel. He opined that Don does not need a full-time general guardianship and that a less restrictive method of providing for Don's needs would be appropriate for Don's best interests.

The District Court relied on Dr. Carlson's opinion and

continued the guardianship, limiting the guardian's powers as follows: to care and maintain Don, when and if he should become incapable of doing so himself; to assert and protect Don's rights, should he be unable to do so for himself; to provide timely and informed consent to necessary medical procedures, in the event that Don is unable to do so for himself; and to assist Don in obtaining the necessary training and education. The District Court also continued the conservatorship in its present form.

## Issue I: Guardianship

Did the District Court err in establishing a limited guardianship?

Norwest Capital and Mary Lou West agree with the District Court's termination of the general guardianship and appointment of Mary Lou West as limited guardian. They oppose the complete removal of a guardian. Don opposes any sort of guardianship.

Mary Lou West has handled many of Don's personal arrangements since his accident in 1976. The record establishes that this arrangement is not presently necessary. Don resides in Colorado and Mary Lou West resides in Montana. She acknowledges his remarkable recovery and testified that she now believes that Don is capable of making most decisions about his property and his life. She further recognizes that the constant supervision and protection once required for Don is no longer necessary and that he needs some independence

Pam Ness testified that Norwest Capital is opposed to dealing directly with Don if a trust were to be established and that it preferred to deal with a third person because of Don's physical

8

disabilities, particularly his blindness, and his inability to comprehend mathematical and investment transactions well.

Don contends that the District Court's decision to retain a limited guardian is incorrect for two reasons. First, he contends that he no longer meets, the definition of "incapacitated person" set forth in § 72-5-101(1), MCA:

> "Incapacitated person" means any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause (except minority) to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person or which cause has so impaired the person's judgment that he is incapable of realizing and making a rational decision with respect to his need for treatment.

Don relies on In the Matter of the Guardianship and Conservatorship of Swandal (1984), 210 Mont. 167, 171, 681 P.2d 701, 703, as support for his argument that a guardianship is improper where a person has physical disabilities but is not mentally infirm. Don contends that the only disabilities that have continued are physical and, as such, they are insufficient to constitute a guardianship according to Swandal. This was not the finding of the District Court. Dr. Carlson testified that Don was not likely to improve beyond his present capabilities and that he has some mental impairment, as noted below in more detail. The District Court concluded that both Don's mental and physical impairments supported a continuance of the guardianship, with limits on the powers of the guardian.

Second, Don claims the court erred because the Conclusions of Law and Order do not comply with the requirements of § 72-5-316,

9

MCA, because the statute does not permit the court to establish a limited guardianship when the protected person can meet the essential requirements for his physical health and safety. Section 72-5-316, MCA, provides in pertinent part:

> (1)  If the court is satisfied that the person for whom a guardianship is sought is incapacitated and that judicial intervention in his personal freedom of action and decision is necessary to meet essential requirements for his physical health or safety, it may appoint a . . . limited guardian having the powers described in the order.  If the court is satisfied that the allegedly incapacitated person could handle the essential requirements for physical health or safety if his financial resources were managed by another, it shall order that the petition be treated as a petition for a protective order under part 4 of this chapter and proceed accordingly.  Alternatively, the court may dismiss the proceeding or enter any other appropriate order that is not inconsistent with the specific provisions of this part. . .

Don further argues that the conditional powers given to Mary Lou West here are for potential future needs, not for current needs, and that the statute provides no basis for this sort of guardianship when there is no current need for it.

The respondents, Mary Lou West and Norwest Capital, argue that the guardianship statute contemplates this sort of arrangement by requiring a guardianship to be tailored to those areas where it is foreseeable that the protected person may require assistance in the future; here, to prevent some person or persons from taking advantage of Don, for making medical decisions for Don, and to provide for the need to act on Don's behalf to obtain training and education programs for him. Finally, the respondents contend that someone must continue to act in the capacity of a limited guardian in order that Don's best interests are served.

10

Section 72-5-306, MCA, describes the purpose and basis for appointing a guardian, whether it be a full or a limited guardianship:

> Guardianship for an incapacitated person may be used only as is necessary to promote and protect the well-being of the person. <u>The guardianship must be designed to encourage the development of maximum self-reliance and independence in the person and may be ordered only to the extent that the person's actual mental and physical limitations require it</u>. An incapacitated person for whom a guardian has been appointed is not presumed to be incompetent and retains all legal and civil rights except those that have been expressly limited by court order or have been specifically granted to the guardian by the court. (Emphasis supplied.)

The limited guardianship in this case does not permit Mary Lou West to intervene in most of Don's personal affairs. The guardianship is now very limited and enumerates only certain decisions that Mary Lou West may make for Don, and she can only make these decisions in the event Don is unable to do so. Clearly, this complies with the statutory mandate emphasized above to encourage the development of maximum self-reliance and independence.

The evidence submitted to the court relative to Don's mental and physical condition consisted of a series of letters from physicians who had either provided medical services to or had examined him for the purpose of the proceeding, persons who had provided rehabilitative services and training to him and from the court-appointed visitor. Some were authored in 1991 and did not express opinions as to Don's condition at the time of the hearing. The court-appointed visitor, who is also the person employed as his care manager, opined that Don had the capacity of coordinating the services he needs in managing his daily life, but felt that the

11

continuation of the guardianship was appropriate, with the guardian's powers being limited to providing guidance in managing Don's financial concerns regarding the gifting of money and overseeing his financial portfolio.

Dr. Carlson also expressed the opinion that Don did not need a full-time guardian, although he needs help in managing his financial affairs. Dr. Carlson further stated that because of the nature of Don's injuries, any clinical improvement beyond his present condition was unlikely. As previously stated, Dr. Carlson found that Don has deficits in information gathering, concentration, memory and in mathematical reasoning and calculating. Based on the foregoing, the court found that Don's disabilities continue to exist and that he remains physically and mentally incapacitated, although to a much lesser extent than when the full guardianship was established. With that in mind, the court designed an extremely limited guardianship arrangement. The limited guardianship allows Don to have broad powers over his daily living arrangements while he is able to live independently.

Don is presently able to provide for his own care. He testified that he also would be able to provide for substitute help, should the need arise, by contacting appropriate Colorado authorities. However, his disability is of such nature and character as to prevent him from fully and completely protecting himself and his property interests from those who might take advantage of him. The powers of the limited guardianship contemplate that he may not be able to arrange for adequate care

12

providers, that he may not be able to make timely and informed medical decisions, that he may need assistance in asserting and protecting his rights and that he will likely need some form of assistance in obtaining training and education. The mere fact that he is currently providing for his personal needs does not support a conclusion that he can do so in the future.

The District Court in this case narrowly formed the limited guardianship to provide for Don's unique needs, in accord with the testimony and other evidence presented at the hearing. Subject to restrictions under the guardianship statutes, such decisions are committed largely to the discretion of the court. This Court will not interfere with the exercise of the appointing court's discretion unless the court has abused its discretion. In the Matter of the Guardianship of Nelson (1983), 204 Mont. 90, 94, 663 P.2d 316, 318. Section 72-5-316, MCA, gives the court discretion in determining whether a guardianship should be a full or a limited guardianship and, if limited, to determine the responsibilities which are to be handled by the limited guardian.

The powers conferred on a guardian should be as clearly defined as circumstances permit. We conclude the limited guardianship arrangement formulated by the District Court will allow Don to have almost total autonomy, except in the area of his financial affairs, while still providing the guardian with powers in the event the guardian becomes aware that Don is unable to handle certain of his personal affairs. We conclude that the District Court did not abuse its discretion in determining that a

13

limited guardianship was appropriate in light of the facts in this case and the stated objective in § 72-5-306, MCA, to encourage maximum self-reliance and independence and to promote and protect the well-being of the person.

We hold the District Court properly exercised its discretion in establishing the limited guardianship in this case.

Issue II: Conservatorship

Did the District Court err in denying the joint petition to terminate the conservatorship?

Don filed a petition to terminate the conservatorship and the guardian and conservator filed cross-petitions to terminate the conservatorship. Mary Lou West and Norwest Capital desired to establish a trust rather than a conservatorship in order that there might be more flexibility in managing Don's finances. To the extent of his capacity to understand the nature of a trust allowing him to have more control over his money, Don also wants such an arrangement. Don's desire for a trust instead of a conservatorship is motivated by his wish to make gifts and to help others. The court denied both petitions, stating that "[t]he agreed facts do not demonstrate that it is in the best interest of the protected person to terminate the conservatorship."

Don testified that he desired to end the conservatorship so that he might be permitted to make gifts to relatives and others, particularly other victims of closed head injuries. Don wanted to buy a car for his mother for Christmas and was disappointed in not being able to do so because of the statutory limitation of 20% of conservatorship income, which would have prevented a gift in excess

14

of $12,000.  Don also wants to help his nieces and nephews with their college education expenses.  He maintains that he is totally competent to make decisions about his finances, although he agrees that his money needs some protection.

Mary Lou West and Pam Ness, a Trust Officer for Norwest Capital, discussed the advantages of a trust arrangement as an alternative to the conservatorship, particularly for estate tax purposes, to address Don's needs and desires and to remove the authority of the District Court to oversee Don's estate by annual review of financial statements.  Respondents contend that it is unnecessarily time-consuming and costly to burden the district courts with issues of this type whenever a protected person wants to make a substantial gift and to limit the amount of gifts each year to 20 percent of the income of the estate.  Respondents argue that, as trustee instead of conservator, Norwest Capital would be better able to handle this sort of transaction, taking into account the provisions of the trust agreement, which could be structured in order to protect Don's interests.  Norwest Capital would have the same fiduciary duty under either arrangement.  The respondents further argue that questions of whether gifts are appropriate are best made in private by the trustee and not in a courtroom setting.

In considering these arguments, we notice the complete absence of any estimation of Don's future needs and a balancing of those needs with the desires of the parties.

In their petition to terminate the conservatorship and establish a trust, the respondents also expressed the desire to be

15

able to consider the interests of and to benefit remainder beneficiaries of Don's estate by gifting and tax planning. The respondents claim that conversion of the Don West Conservatorship to a trust would serve Don's best interests, needs and desires. Don's "best interests," according to respondents, include the right to consider and select the potential beneficiaries of his estate and to formulate a plan to maximize gifts and minimize tax impacts. Pam Ness testified that a trust would better serve Don's interests for tax purposes although she testified that she could not explain or specify any of the alleged tax advantages because she was not a tax expert. Again, there has been no consideration of the balancing of the potential benefit of a program of gifting and the resultant tax impact with Don's future needs.

The conservator has handled Don's assets since 1978, investing and reinvesting the funds, and has paid out funds to Don and to others for Don's benefit. By September 17, 1993, the value of the assets was $1,084,239 and the income from the assets is approximately $60,000 per year, and consistently exceeds the amount expended for Don's living expenses. The final pretrial Order submitted to the District Court stated, as an agreed fact, that the projected Montana inheritance and federal estate tax burden, in the event of Don's death, amounted to approximately $230,000; and that Don desired to make gifts to his mother, his brother, his sister, and his nieces and nephews, but is not permitted to do so under Montana conservatorship law. These agreed facts were the basis of the petition by the guardian and the conservator to terminate the

16

conservatorship and to create a trust.

The District Court determined that these agreed facts do not demonstrate that it is in the best interest of the protected person to terminate the conservatorship. In denying the requests to dissolve the conservatorship, the District Court stated:

> It would seem to be in the protected person's best interest to maintain what assets he has to protect him against the uncertainties of the future. The only ones to stand to benefit from a program of gifting would be those who receive the gifts and possibly, those persons who are the devisees of his estate upon his death.

Clearly, the District Court considered the uncertainties of the future and the possibility that Don's monetary needs, although not great at this time, may escalate in the years to come. We stress again the absence of any testimony from any of the parties as to the amount that will be needed to provide for Don's future needs. Without such evidence, the District Court had no basis for changing the present conservatorship. The money initially deposited into the conservatorship account, which under the management of Norwest Capital has nearly tripled since the end of 1978, was the result of a personal injury settlement intended to provide for Don's needs for the remainder of his life. The Social Security Disability payments are also intended for his benefit. At age 43 and in good health, his present needs are likely less than his needs will be toward the end of his life. Medical and other care expenses can quickly exhaust the resources of critically ill persons and there is no way to accurately forecast the amount that may be required in the modern day world where the reality is that medical costs have escalated at a much more rapid rate than most other costs. We

17

therefore strongly agree with the conclusions reached by the District Court with regard to the uncertainties of the future.

Further, if the purposes of the estate included making provisions for the best interests of heirs or devisees, then certainly tax planning--including a program of gifting--would be appropriate. However, we are not concerned with maximizing the estate for such future heirs and devisees and that would not be a stated purpose in establishing a trust for Don. These aspects demonstrate the absence of apparent concern for Don's future needs. With the present limited guardianship, whereby Don has very broad powers to maximize his autonomy, creation of a trust as suggested here is not appropriate. The guardian has no powers over financial transactions; these would be vested with the trustee, who is not in a position to know what will be needed for Don's care in the future. Norwest Capital did not want to deal directly with Don in the event that a trust was established. Therefore, in order to maximize Don's independence, it is necessary to continue the conservatorship.

Moreover, the sort of arrangement in place here--limited guardianship and conservatorship--does not prevent Don from making a will to dispose of his property upon his death. Under a conservatorship, the court has certain enumerated powers which may be exercised directly or through a conservator. These powers include "all the powers over his estate and affairs which he could exercise if present and not under disability, except the power to make a will." Section 72-5-421(3), MCA. One of these powers is

18

the power to make gifts.  However, there are limits on the power to make gifts, because of the importance of that power.  See § 72-5-428(2), MCA.

Establishment or, as in the present case, continuance, of the conservatorship has no effect on the capacity of the protected person.  Section 75-2-421(5), MCA; and Montana Conference of the Seventh-Day Adventist Church v. Estate of Miller (1981), 192 Mont. 468, 476, 628 P.2d 1100, 1105.  As noted above, a limited guardianship may be established because of limited mental or physical incapacity in one particular area of functioning, but the person may be entirely competent in other respects.  Miller, 628 P.2d at 1105.  Thus, the mere fact that a conservator has been appointed does not mean that the protected person lacks the capacity to make a will.  The power to make a will for directing the disposition of one's property upon death is expressly not given to the court along with other statutorily granted powers in § 72-S-421, MCA.  The District Court addressed this point, stating:

> The mere fact that a Conservator has been appointed does not mean that the protected person lacks the capacity to make a will.  If the protected person, in this case, should want to leave his property, in the event of his death, to certain of his relatives, and it can be determined that he possesses the necessary testamentary capacity, such a will would be valid, notwithstanding the fact that he has a Conservator.

We agree with this analysis of Don's capacity and rights concerning the testamentary disposition of his property.

The District Court also concluded that the purpose of a conservatorship is to conserve the assets for the benefit of the protected person and that the mere fact that at this time, Don's

19

living expenses are less than the income from his estate, does not mean it would be in his best interests to give away his estate. During the hearing, the following exchange occurred:

THE COURT: Tell me, all I hear is magical words, tax planning, what tax planning is appropriate for someone who's 42 years old?

[Ms. Ness]: (No oral response.)

THE COURT: Do you have a crystal ball to tell anyone how much it's going to take him to live out the rest of his life?

THE WITNESS: No, we don't.

THE COURT: All right. Well, now, is there any tax planning that you're aware? Are you an expert in the field?

THE WITNESS: I do not profess to be an expert at all.

This was the extent of the testimony concerning tax planning and no evidence was presented to estimate future needs. At 43 years of age and in good health, there is no way to determine what Don's needs may be in the future.

The purpose of the Don C. West Conservatorship estate is to provide for Don's best interests and his present and future care. Don is unable to manage his property and financial affairs not only because of his physical disability (blindness), but also because he is impaired in his ability to comprehend mathematics and, thus, his ability to understand his financial affairs. He admits that he needs this sort of help and also that his money needs protection. He also needs proper management to preserve his estate to provide for his support, care and welfare in the present and in the future.

It is unfortunate that Don does not have the ability to make

detailed mathematical judgments to determine his future needs. His major expenses in the past have been totally handled by either his guardian or conservator. Under the present limited guardianship, the District Court has structured an arrangement that will give Don broad control over his personal care needs in order to maximize his self-determination and independence while maintaining control of his finances to assure his future needs are provided for as fully as possible. In today's world, anyone and particularly a severely handicapped person can use up a million dollars in a relatively short period of time if physical and mental health decline. Again, there was no evidence presented addressing this possibility, although one of the physicians noted that a person who has previously sustained the sort of head trauma experienced by Don may be a victim of premature senility, with an onset as early as age 55 years. The sort of trust desired by the parties does not consider such possibilities and there was a noted absence of consideration by the parties on this topic.

In fact, the nature of the evidence presented in this case emphasizes the desires of the parties without the appointment of a guardian ad litem to specifically address these future needs in relation to Don's best interests. Don's counsel represented Don and addressed Don's wishes. However, the limited evidence presented indicates that Don does not have the capacity to compare his own needs to those of others. In other cases of this nature, where the guardian has interests possibly adverse to the best interests of the ward, it may be appropriate for the court to

21

appoint a guardian ad litem to specifically address the protected person's future needs for purposes of the proceeding.

We also conclude that tax planning for purposes of the estate tax burden upon the incident of Don's death is simply not a consideration which is in the best interests of providing for his care while he is alive. Gifting for the purpose of reducing the amount of estate tax is, in and of itself, insufficient to justify the gifting of the estate and does not preserve the estate for the purpose of providing for Don's needs.

Under the present guardianship, the guardian has very limited powers. If the conservatorship were to be converted to a trust, it would be necessary to appoint a guardian with very broad powers and the capacity to make well-reasoned financial decisions as Don does not have an adequate capacity to compare his own needs to those of others. It is apparent that the District Court carefully considered Don's best interests, both present and future, by structuring a limited guardianship with few powers and continuing the conservatorship to ensure that Don's future needs are **met.** Don's desire to establish a trust to replace the conservatorship is motivated by his wish to make gifts and to help others. Don also testified that he was interested in counseling other **victims** of head injuries. During the hearing, he testified extensively and it is apparent to this Court that he has substantial mental capacity despite his particular impairments, that he is an empathetic individual who cares deeply about other persons, and that he was able to respond appropriately to lengthy questioning directed

toward his ability to care for his personal needs. He has made a remarkable recovery from his situation in 1978, referred to by the court-appointed visitor from the Montana Department of Social and Rehabilitative Services as "unable to manage for himself in society."

The District Court determined that the only persons to be benefited by a program of gifting and other estate tax planning, according to the evidence presented at the hearing, are the persons to receive the gifts and the devisees of his estate upon his death. This Court will uphold the decision of the District Court unless the District Court has abused its discretion. In exercising its discretion, the District Court must be guided by the best interests of the protected person. Clearly, the court considered Don's best interests in deciding to continue the conservatorship. We conclude that the record supports the finding that Don's future needs are best served by a continuance of the present conservatorship and that the reasons proposed by the parties do not constitute sufficient justification for dissolving the conservatorship and establishing a trust.

We hold the District Court properly exercised its discretion in continuing the conservatorship in this case.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

23

_John Conway Harrison_

_Jim Trieweiler_

_William E. Hunt_

_Karla M. Gray_

_____
Justices

24

Justice James C. Nelson specially concurs:

I concur in the result of our opinion and, for the most part, with our legal analysis. Aside from that, I do not concur in certain statements that are made in the opinion.

_____
                                    Justice

December 20, 1994

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Terry L. Seiffert
Attorney At Law
Box 31181
Billings MT 59107-1181

R. Bruce Harper, Esq.
Harper & Stusek
Box 7067
Billings MT 59103-7067

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy